AO 91 (Rev. 02/09) Criminal Complaint

# United States District Court
### for the
### Western District of New York

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. 18-MJ- 642 |
| AMANDA BURGESS | ) | |
| *Defendant* | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of <u>April 26, 2016</u> in the county of <u>Monroe</u> in the Western District of New York, the defendant violated <u>18</u> U.S.C. <u>§§ 371 & 1001(a)(3)</u>, an offense described as follows:

the defendant knowingly and willfully used a false document, knowing it to contain materially false statements, in a matter within the jurisdiction of the executive branch of the United States Government, and that she conspired with others to do the same, all in violation of 18 U.S.C. §§ 371 and 1001(a)(3).

This criminal complaint is based on these facts:

X   Continued on the attached sheet.

Please see attached affidavit

_____
*Complainant's Signature*

Jason J. Fernandes, S/A USDOT OIG
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 9/5/18

_____
*Judge's signature*

City and State:   Rochester, New York      Hon. Jonathan W. Feldman, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

STATE OF NEW YORK   )
COUNTY OF MONROE   )  ss
CITY OF ROCHESTER   )

I, Jason J. Fernandes, being duly sworn, depose and say as follows:

1.   I am a Special Agent with the United States Department of Transportation ("USDOT") – Office of Inspector General, and have been so employed for 2 years. I have been trained to investigate, and have participated in investigations of, a range of federal criminal violations impacting the USDOT, including fraud. I am empowered by law to conduct investigations of, and make arrests for, offenses against the United States.

2.   This affidavit is made in support of a criminal complaint charging AMANDA BURGESS with violations of Title 18, United States Code, Section 371 (conspiracy) and 1001 (false statements).

3.   The information supplied in this affidavit is based on my own investigation of this case, including witness interviews and review of records, information supplied by other law enforcement agents and USDOT personnel, and my experience and background as an USDOT Special Agent. Because I am submitting this affidavit for the limited purpose of securing an arrest warrant, I have not set forth each known fact known to me about this matter. Rather, I have set forth only those facts that I consider necessary to establish that there is probable cause to believe that AMANDA BURGESS violated Title 18, United States Code, Sections 371 and 1001.

## BACKGROUND INFORMATION

4.  The Federal Motor Carrier Safety Administration ("FMCSA") is an agency of USDOT. Its primary mission is to reduce crashes, injuries, and fatalities involving large trucks and buses. FMCSA has adopted regulations governing commercial motor carriers ("motor carriers"), including regulations requiring motor carriers to be properly licensed, insured, maintained, and operated.

5.  Motor carriers operating in interstate commerce must obtain a USDOT number. The USDOT number is a unique identifier that aids FMCSA in collecting and monitoring a motor carrier's safety record and other information, including but not limited to audits, compliance reviews, crash investigations and inspections. To obtain a USDOT number, motor carriers complete and submit to USDOT, under penalties of perjury, a Form MCS-150, Motor Carrier Identification Report.

6.  Many motor carriers operating in interstate commerce are also required to complete and submit to USDOT, under penalties for perjury, an additional form known as a Form OP-1, Application For Motor Property Carrier and Broker Authority. This form is used to obtain interstate operating authority from USDOT based on business of the individual motor carrier (*e.g.*, Motor Carrier of Property (except Household Goods), Motor Carrier of Household Goods (Moving Company)). The specific operating authority granted is reflected in a unique identifier known as an MC Number that is assigned by USDOT. Among other things, the MC Number determines what types and levels of insurance the motor carrier must obtain prior to receiving operating authority from USDOT.

7.  Form OP-1 requires an applicant seeking operating authority to provide the following information, among other things: the motor carrier's business address; the motor

2

carrier's insurance information; information regarding the motor carrier's compliance with USDOT safety regulations; and the motor carrier's relationship and affiliation with any other motor carrier within the past 3 years.

8. To prevent motor carriers from concealing poor safety or compliance records, federal regulations require motor carriers to identify reincarnated and affiliated motor carriers that share common ownership, common management, common control or common familial relationship. In particular, Title 49, Code of Federal Regulations, Section 385.1003, prohibits two or more motor carriers from using common ownership, common management, common control, or common familial relationship to avoid compliance with legal requirements or otherwise mask or conceal non-compliance or a history of non-compliance.

9. FMCSA routinely performs compliance reviews on motor carriers. A compliance review consists of an on-site examination of the motor carrier's operations, such as drivers' hours of service, maintenance and inspection of vehicles, driver qualifications, commercial driver's license requirements, financial responsibility, accidents, hazardous materials, and other safety and transportation records to determine whether a motor carrier meets the safety fitness standard. A compliance review may also be conducted in response to a request to change a safety rating, to investigate potential violations of safety regulations by motor carriers, or to investigate complaints or other evidence of safety violations. The compliance review may result in the initiation of an enforcement action by FMCSA.

10. A motor carrier is issued a safety rating after a compliance review is completed. There are four types of safety ratings: Satisfactory, Conditional, Unsatisfactory, and Unrated.

    a. An Unrated carrier means that a safety rating has not been assigned to the motor carrier by the FMCSA. When a motor carrier is first established, they are classified as an Unrated carrier until a compliance review is conducted.

3

b.  A Satisfactory safety rating means that a motor carrier has in place and functioning adequate safety management controls to meet the safety fitness standard.

c.  A Conditional safety rating means a motor carrier does not have adequate safety management controls in place to ensure compliance with the safety fitness standard.

d.  An Unsatisfactory safety rating means a motor carrier does not have adequate safety management controls in place to ensure compliance with the safety fitness standard, which has resulted in occurrences.

11. A motor carrier's safety rating is significant for various reasons, and affects its insurance rates and ability to compete for business. An Unrated motor carrier is eligible for more favorable insurance rates than a Conditional motor carrier, who has a documented history of safety issues.

12. FMCSA maintains an online records repository called the Safety and Fitness Electronic Records ("SAFER") System that is is accessible over the Internet through a website. FMCSA uploads information provided by the motor carriers, including the business name, business address, business telephone number, and insurance information. Information such as the number of drivers, crashes, insurance and bonds, inspections and enforcement activity are available on SAFER. The public may access the SAFER system to assess a particular motor carrier. SAFER is often utilized by insurance companies and customers to obtain information on a motor carrier.

PROBABLE CAUSE

13. AMANDA BURGESS was (and is currently believed to be) employed by the owners of certain interrelated motor carrier entities based in the Rochester, New York region, including but not limited to motor carriers known as Orange Transportation Services, Inc., and Dallas Logistics, Inc.

4

14. BURGESS was identified in various documents and interviews as an employee handling accounting, insurance, and claims for certain motor carriers, including Orange Transportations Services and Dallas Logistics.

15. From April 12, 2016, through May 16, 2016, FMCSA conducted a compliance review of Dallas Logistics.

16. The October 23, 2012 Form OP-1 for Dallas Logistics identifies J.Z. as its president. The Form OP-1 stated, among other things, that Dallas Logistics' business address was in Dallas, Texas, and that it was <u>not</u> affiliated during the past 3 years with any other FMCSA regulated entity (including Orange Transportation Services).

17. During the compliance review, the FMCSA inquired why Dallas Logistics claimed to be located in Dallas, Texas, when, in fact, it had become apparent that Dallas Logistics was located and operated out of Rochester, New York.

18. In response to the FMCSA's inquiry, on or about April 26, 2016, BURGESS signed a letter addressed to USDOT on behalf of Dallas Logistics letterhead that stated the following:

> *Originally, Mr. [J. Z.] was going to relocate with this family to Dallas, Texas in order to run the trucking company. As [J. Z.] was finalizing his plans, his mother got seriously ill. This prolonged the progress on the move to Texas. Shortly after, his father also developed health aliments and based on these circumstances, Dallas Logistics remains in New York...*

19. During the compliance review, in May 2016, a FMCSA investigator travelled to 25 Pixley Industrial Parkway, Rochester, New York, in the Western District of New York, to review the purported principal place of business for Dallas Logistics. Present at this inspection, were J.Z. and BURGESS, who represented that this location was the principal

5

place of business for Dallas Logistics, that J.Z. was the owner and president of Dallas Logistics, and that BURGESS was the operations manager for Dallas Logistics.

20. As explained below, the statements contained in April 26, 2016 letter and made to the FMCSA inspector in May 2016, were materially false and part of an orchestrated effort by BURGESS and her employers to conceal the fact that Dallas Logistics was an affiliate and reincarnation of Orange Transportation Services. Had the affiliation between Orange Transportation Services and Dallas Logistics been disclosed to USDOT, Dallas Logistics' rating would have been negatively impacted. Specifically, Dallas Logistics would not have received an initial safety rating of Unrated, but would have received a Conditional safety rating at best.

21. On or about March 9, 2012, that is, prior to the creation of Dallas Logistics, USDOT gave Orange Transportation Services a Conditional safety rating as the result of a compliance review by FMCSA. On or about April 23, 2012, Orange Transportation Services wrote a letter to USDOT concerning a corrective action plan to address the safety rating. The letterhead indicated that Orange Transportation Services was located in South Carolina, and was signed by J.Z. On or about September 12, 2012, Orange Transportation Services sent another letter, signed by J.Z., to USDOT asking that its safety rating be upgraded from Conditional. On or about October 12, 2012, USDOT denied the request.

22. As noted above, Dallas Logistics submitted its Form OP-1 to USDOT on or about October 23, 2012, which was a few weeks after USDOT declined to upgrade Orange Transportation Services' safety rating.

23. Special Agents interviewed J.Z. on about December 27, 2017. During the interview, J.Z. explained that he previously worked for Orange Transportation Services. At

some point, the owner of Orange Transportation Services approached him about creating a new motor carrier entity, Dallas Logistics, with J.Z. to be identified as the purported owner and president.

24. J.Z. stated that he agreed to this arrangement because he believed Orange Transportation Services would go defunct if he did not, and that he would then be unemployed. J.Z. stated that he is the "paper president" only of Dallas Logistics.

25. J.Z. stated that the letter prepared and sent by BURGESS on April 26, 2016, was done without his knowledge, and that the statements in the letter regarding J.Z. and his purported plan to relocate to Dallas, Texas, and the health issues of his parents were all false.

26. J.Z. stated that the owners of Orange Transportation Services and Dallas Logistics (and other interrelated motor carrier entities) commonly set up sham principal places of business to mislead FMSCA auditors, and that the 25 Pixley Industrial Parkway location was such a sham location.

27. According to FMSCA inspectors, motor carriers can use false principal places of business as part of an effort to conceal their affiliations with other motor carriers.

28. Additional investigation has shown that BURGESS, and her employers, appear to have engaged in a pattern of forming reincarnated motor carrier entities, while concealing the interrelatedness of such motor carrier entities from USDOT.

29. As a result of the above misrepresentations, BURGESS and others were able to operate, and continue the operation of Orange Transportation Services as Dallas Logistics (as well as other motor carrier entities found to have engaged in various unsafe practices), and thereby impede and obstruct the FMCSA from administering and enforcing its regulations concerning financial responsibility, safety, maintenance and drivers.

30. As a result of the above misrepresentations, BURGESS and others were able to fraudulently buy insurance for Dallas Logistics (and other motor carrier entities that were, or should have been, rated Conditional) at the lower rates applicable to Unrated motor carriers.

31. In addition, customers reviewing the incorrect safety rating of Dallas Logistics posted on SAFER (that is, its Unrated safety rating), would have been deceived about the history and safety record of that motor carrier. Based on my experience, a Conditional safety rating is viewed more negatively by customers than an Unrated or Satisfactory rating, and absent a price discount, customers would not prefer to ship their goods using a motor carrier rated Conditional.

## CONCLUSION

32. Based on the foregoing, I respectfully submit that there is probable cause to believe that, between in or about April 2016 and May 2016, the defendant, AMANDA BURGESS, knowingly and willfully made materially false statements and representations in a matter within the jurisdiction of the executive branch of the United States Government, and conspired with others to do the same, all in violation of 18 U.S.C. §§ 371 and 1001.

_____
Jason J. Fernandes
Special Agent, USDOT OIG

Sworn to and subscribed before me
this _5_ day of September ,2018

_____
Hon. Jonathan W. Feldman
United States Magistrate Judge

8